Cite as 2021 Ark. 90

# SUPREME COURT OF ARKANSAS

No. CV-19-934

|  |  |
|---|---|
| LARRY WALTHER, CABINET SECRETARY, ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION<br><br>APPELLANT<br><br>V.<br><br>WELSPUN TUBULAR, LLC<br>APPELLEE | Opinion Delivered: April 22, 2021<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-17-3384]<br><br>HONORABLE W. MICHAEL REIF, JUDGE<br><br>AFFIRMED. |

**BARBARA W. WEBB, Justice**

Larry Walther, Cabinet Secretary of the Arkansas Department of Finance and Administration (ADFA) appeals from an order of the Pulaski County Circuit Court finding in favor of Welspun Tubular, LLC (Welspun) in a challenge to a disallowed compensating-use-tax exemption. On appeal, ADFA argues that the circuit court erred in finding that (1) steel grit is tax exempt under Arkansas Code Annotated § 26-53-114(a)(1); (2) replacement purchases of steel grit were exempt from tax under Arkansas Code Annotated § 26-53-114(a)(2); (3) Welspun manufactures an article of commerce; and (4) steel grit is an item of equipment. We affirm.

## I. *Facts*

Welspun manufactures heavy-duty pipes for use by the oil and gas industry. All pipe is "make-to-order" or a completely customized order, and all orders are unique in nature, prepared to each customer's specifications. Some of the pipes manufactured by Welspun require a coating of epoxy. To make the epoxy adhere to the pipe, Welspun subjects the pipe to a blasting process in which angular pieces of steel called "grit" and round pieces of steel called "shot" are used to create a surface profile. The surface profile consists of "peaks and valleys" on the pipe that facilitate the adhesion of the epoxy coating.

This case focuses on Welspun's effort to obtain a tax exemption for the grit. There are various sizes and hardnesses of the grit. It is specially purchased for a particular order to meet the customer's requirements. The grit is bought in bulk in either fifty-pound bags or fifty-five-gallon drums. The grit is not an item reflected on Welspun's balance sheet for the purpose of being depreciated, and it is not treated as a fixed asset.

The blasting process uses the centrifugal force of a turbine. The turbine propels the grit onto the exterior or interior surface of a pipe. After hitting the pipe, the grit falls into a basin. In the basin, a screw conveyor delivers the grit to a bucket elevator and the elevator takes the grit back to the top hopper. The grit recycles through the blasting process and lasts for a certain number of cycles––estimated to be between 2000 and 3000––before eventually being reduced to dust. The dust is removed from the process through a vacuum system and discarded. The steel grit is continuously replenished at a rate between one and six 50-pound bags per hour.

A blast machine consists of multiple self-contained components including a cabinet, hoppers, an elevator, a separator, screw conveyors, turbines and their motors, an air wash system, a vacuum system, a dust collector, and bag filters. The grit has no effect on the pipe without the blast machine, and the blast machine has no effect in the process without the grit. The grit requires mechanical energy to perform its work. This mechanical energy is supplied by the turbines, which accelerate the grit to the velocity required to have the desired effect of cleaning and grading pipe.

ADFA initiated a "sales and use" tax audit of Welspun's books and records for the reporting periods May 1, 2009, through April 30, 2012. Throughout the audit period, Welspun used only three types of grit and one type of shot. All of the grit was purchased in response to a customer's order.

Welspun announced three expansions during the audit period. The first was in 2010, but that expansion did not involve its coating facility. The second was in 2011 and did include the coating facility, but there was no increase in the number of square meters of pipe that could be coated during the audit period. The third was in 2012 but was not completed until after the audit period. The parties stipulated that from the beginning of the audit period in May 2009 to the end of the audit period in May 2012, the number of employees at the Welspun facility increased from 253 to 388.

The audit resulted in an assessment of compensating-use tax totaling $162,266.55 on Welspun's purchases of grit during the audit period. Welspun challenged the assessment administratively and claimed that the purchases of grit were exempt from tax as the purchase

of manufacturing equipment. After an administrative hearing, the assessment of tax was sustained.

In 2014, Welspun filed a de novo appeal of the administrative decision pursuant to Arkansas Code Annotated § 26-18-406 (Supp. 2019). After the denial of competing summary-judgment motions, the matter proceeded to trial. Welspun urged the circuit court to rely on our decision in *Walther v. Weatherford Artificial Lift Systems*, 2015 Ark. 255, 465 S.W.3d 410, in which we held that silica sand used in the fracking process was tax-exempt equipment, and *Weiss v. Bryce Co., LLC*, 2009 Ark. 412, 330 S.W.3d 756, in which we held that "stickyback" tape was likewise tax-exempt equipment.

Finding for Welspun, the circuit court made the following factual and legal conclusions: (1) Welspun is a manufacturer of articles of commerce; (2) the steel grit purchased by Welspun has complexity and continuing utility and is equipment used directly in manufacturing an article of commerce; (3) Welspun proved expansion of its facility for purposes of the claimed exemption; (4) Welspun proved that its purchases of steel grit satisfied the criteria for replacement equipment for purposes of the claimed exemption manufacturing equipment; and (5) ADFA erroneously assessed tax on Welspun's purchases of steel grit. This appeal followed.

## II. *Standard of Review*

We review a circuit court's decision in a tax case de novo. *Rent-a-Center East, Inc. v. Walther*, 2021 Ark. 10, 615 S.W.3d 701. However, a circuit court's factual findings will not be set aside unless they are clearly erroneous. We review issues of law requiring statutory

4

interpretation de novo. *Walther v. FLIS Enters., Inc.*, 2018 Ark. 64, at 5, 540 S.W.3d 264, 268.

### III. *Arguments and Analysis*

ADFA first argues that the exemption found in Arkansas Code Annotated § 26-53-114(a)(1) applies only to purchases of machinery and equipment not previously owned by a taxpayer. It asserts that to hold otherwise would render the exemption for replacement purchases found in Arkansas Code Annotated § 26-53-114(a)(2) superfluous. ADFA argues further that the exemption in section 26-53-114(a)(1) applies only if the purchase of the machinery and equipment results in the creation of a new manufacturing plant or facility or the expansion of an existing manufacturing plant or facility as required by subdivision (a)(1)(B). Accordingly, ADFA contends that the circuit court committed reversible error because the grit in question was not new machinery or equipment, but merely "replacement purchases," which, by statute, are not entitled to the exemption. Furthermore, ADFA asserts that even if subdivision(a)(1)(B) were interpreted as a stand-alone qualification, Welspun's grit purchases would fail to satisfy the requirements of that exemption because those items were not purchased to create or expand an Arkansas manufacturing plant or facility.

Welspun counters that there is abundant evidence in the record that the grit was used to create a new, or expand an existing, manufacturing plant or facility as required by section 26-53-114(a)(1)(B). Under Rule GR-55, a "plant expansion" may be either physical or economic. *See* Ark. Admin. Code § 006.05.212-GR-55(C)(2), (3). An economic expansion may occur either by "a. Increasing production, volume; or, b. Increasing employment; or, c.

Increasing the number of different types or models of property that can be manufactured." *See id.* § 006.05.212-GR-55(C)(2). Welspun notes that evidence was introduced at trial showing that during the audit period, it increased employment by roughly 50 percent. Further, it increased productivity in its coating process from 600 to 1,000 square meters of pipe surface per hour.

Welspun's argument is compelling. By ADFA's own regulations, purchases of the grit can properly be considered to "expand existing manufacturing or processing plants or facilities within this State." There is proof of expansions in employment and output in the record. Accordingly, the circuit court did not clearly err in finding that Welspun was entitled to the exemption. Because we uphold the circuit court's finding that Welspun was entitled to the exemption for the purchase of the machinery and equipment that results in the expansion of an existing manufacturing plant or facility as required by section 26-53-114(a)(1), we need not consider ADFA's argument that the exemption did not apply to purchases of grit as replacement equipment as provided for in section 26-53-114(a)(2).

We next turn to ADFA's third point in which it argues that the circuit court erred in finding that Welspun manufactures an article of commerce for purposes of the manufacturing-machinery-and-equipment exemption. It asserts that the plain language of section 26-53-114(a)(1) and (2) requires the production of an "article of commerce" as a condition of entitlement to exemption. ADFA asserts, however, that all pipe produced by Welspun is based on a customer's special order, and it produces no items for sale at retail to the general public. ADFA specifically notes that Welspun's own witnesses testified that,

during the audit period, Welspun did not produce any pipe for sale to the general public in the retail market. Citing *C & C Machinery, Inc. v. Ragland*, 278 Ark. 629, 648 S.W.2d 61 (1983), ADFA contends that an article of commerce does not include the production of custom items prepared for specific customers in response to special orders. ADFA also asserts that *Rineco Chemical Industries, Inc. v. Weiss*, 344 Ark. 118, 40 S.W.3d 257 (2001), also supports this point.

Welspun responds that *Rineco* is easily distinguishable on its face because the finished products in that case were literally hazardous-waste materials that the taxpayer paid others to destroy during the audit period. As such, the waste material was "obviously" not "articles of commerce" under any reasonable definition. Welspun further argues that the other case on which ADFA relies, *C & C Machinery*, is factually distinguishable as well as inapposite because its four-decades-old holding was driven by a legal standard––the taxpayer had to prove entitlement to a deduction beyond a reasonable doubt––that no longer applies. In the instant case, the circuit court found that the pipes Welspun manufactures are sold "in the public marketplace" in "all 50 states" to "all the major oil and gas producers and transportation companies in the United States."

We agree that the circuit court did not clearly err in finding that the grit was used to manufacture an article of commerce. ADFA's reliance on *C & C Machinery* is clearly misplaced. In that case, the chancellor made a factual finding that C & C's business was not entitled to the exemption for its machinery because it did not produce an item of commerce. Under the standard of review, reversing this finding would have required the supreme court

7

to hold that the chancellor's finding was clearly against the preponderance of the evidence that C & C failed to prove its entitlement to the exemption beyond a reasonable doubt––a nearly insurmountable burden on appeal, as noted by the court in its opinion. *Id.* We acknowledge that the burden of proof has changed and would not likely yield the same decision today. More importantly, however, we note that the work of C & C Machinery and Welspun are significantly different. In *C & C Machinery,* the supreme court focused on the episodic nature of C & C's business––it operated a machine shop but did not have a specific product line. Conversely, while it is true that Welspun customizes the pipes it manufactures, the circuit court found that the pipes Welspun manufactures are sold "in the public marketplace" in "all 50 states" to "all the major oil and gas producers and transportation companies in the United States." Thus, in our de novo review of the record before us, we hold that the circuit court did not clearly err in finding that the grit was used to manufacture an item of commerce.

For its fourth and final point, ADFA argues that the circuit court erred in finding that grit is an item of equipment. It asserts that grit does not possess the required continuing utility to be considered equipment for purposes of the manufacturing-machinery-and-equipment exemption. ADFA acknowledges that we have defined the term "equipment" to mean "implements, tools, or devices of some degree of complexity and continuing utility." ADFA notes that this court had found sticky back tape used in manufacturing packaging products to be equipment in *Bryce*, *supra*, proppants used in natural-gas extraction to be equipment in *Weatherford Artificial Lift Systems*, *supra*, and chemicals used in manufacturing

8

airplane parts were items of equipment in *Weiss v. ChemFab Corp.*, 336 Ark. 21, 984, S.W.2d 395 (1999). ADFA asserts that grit is not like these products because they all had longer useful lives. ADFA contends that grit begins to break down immediately and must be continuously added to the blasting machine. Further, ADFA points to the testimony of a Welspun employee and its own witness from the shot-blast industry who did not consider steel grit to be equipment. Accordingly, ADFA asserts that the circuit court erred in finding that the grit has the required continuing utility to be considered an item of equipment.

Welspun responds that while both parties agree that it is not possible to calculate the exact lifespan of a single piece of grit, the evidence at trial was undisputed that the grit recycles through the closed-loop blasting system and blasts multiple pipes without being integrated into the pipes it blasts. It notes that ADFA's own witness acknowledged the continuing utility of grit. We agree with Welspun.

To have "some continuing utility," it is not necessary that grit last forever. The phrase "continuing utility" is necessarily a relative term. The fact witnesses below confirmed that grit was not immediately consumed in the blasting process but lasted for some number of cycles as it was continually recirculated. Finally, we reject ADFA's invitation to elevate the fact witnesses' failure to define grit as "equipment" as dispositive of this issue. In context, "equipment" is a legal term, and whether grit is "equipment" for the purposes contemplated by section 26-53-114 is a decision for the courts to decide. Accordingly, we hold that the circuit court did not clearly err in finding that grit is equipment under section 26-53-114.

Affirmed.

WYNNE, J., dissents.

**ROBIN F. WYNNE, Justice, dissenting.** Because I think that steel grit lacks the continuing utility to be considered equipment, I do not think that Welspun's purchases of steel grit are exempt from taxation. Therefore, I respectfully dissent.

This court has defined equipment to include "implements, tools or devices of some degree of complexity and continuing utility." *Ragland v. Dumas*, 292 Ark. 515, 520, 732 S.W.2d 118, 120 (1987). We have also noted that equipment is "an exceedingly elastic term, the meaning of which depends on context." *Id.* The issue here is whether the steel grit has continuing utility. This court has considered this issue on numerous occasions. In *Walther v. Weatherford Artificial Lift Systems, Inc.*, 2015 Ark. 255, at 8–9, 465 S.W.3d 410, 414, this court determined that proppants used in hydraulic fracturing had continuing utility for the life of a well. In *Weiss v. Bryce Co., LLC*, 2009 Ark. 412, at 11–12, 330 S.W.3d 756, 761, we concluded that stickyback tape used in manufacturing packaging for food products had continuing utility because it could be stored and reused. And in *Weiss v. Chem-Fab Corp.*, 336 Ark. 21, 26, 984 S.W.2d 395, 398 (1999), we determined that chemicals used in airplane-parts manufacturing had continuing utility because they were used to create a number of parts, even though they eventually needed to be replaced or replenished. By contrast, in *Dumas*, *supra*, we concluded that gravel used for temporary road construction lacked continuing utility because the gravel became fully integrated into the road, whose utility ends when each oil-extraction project is terminated. 292 Ark. at 520, 732 S.W.2d at 120.

10

In my view, the steel grit lacks the continuing utility necessary to be considered equipment. It is true that the steel grit is recycled through the blast machine, lasts multiple cycles, and is not integrated into the pipe. But the steel grit begins to break down immediately and must be continuously added to the blast machine at a rate of one to six 50-pound bags per hour. It is impossible to determine how long a particle of steel grit lasts. Moreover, it is unknown how many cycles it takes to clean a single pipe. There is no way to tell whether a particle of steel grit is used for more than one pipe. The proppants at issue in *Weatherford* lasted for the life of the well; the tape at issue in *Bryce* could be stored and reused to produce one million linear feet of packaging; and the chemicals at issue in *Chem-Fab* could be used for multiple parts—some chemicals lasted indefinitely, and others lasted for seven to ten days. We do not have evidence of similar continuing utility here. Rather, the steel grit is a material that is consumed. While not dispositive of this issue, testimony at trial also indicated that steel grit is considered a material or consumable, not equipment, in the shot-blast industry.

"This court has held that '[t]here is a presumption in favor of the taxing power of the state, and all tax-exemption provisions must be strictly construed against the exemption.'" *Weatherford*, 2015 Ark. 255, at 10, 465 S.W.3d at 415 (Wynne, J., dissenting) (quoting *Bryce*, 2009 Ark. 412, at 3, 330 S.W.3d at 757). Acknowledging this presumption in favor of the taxing power of the state, I would hold that the trial court clearly erred in finding that the steel grit was equipment, and I would reverse.

I respectfully dissent.

*John Theis*, *Michelle Baker*, *David Scott*, and *Alicia Austin Smith*, Office of Legal Counsel, for appellant.

*Rose Law Firm, a Professional Association*, by: *Amanda K. Wofford*, *Paul Parnell*, and *Joseph Hall*, for appellee.